Arthur W. Tobin and Dorothy Tobin v. Commissioner. Arthur W. Tobin v. Commissioner.
Tobin v. Commissioner
Docket Nos. 62058, 62059.
United States Tax Court
T.C. Memo 1959-244; 1959 Tax Ct. Memo LEXIS 3; 18 T.C.M. (CCH) 1156; T.C.M. (RIA) 59244; December 31, 1959
*3 1. Held, that for each of the taxable years except 1952, the cost of scrap brass and copper purchased by the principal petitioner's metal-smelting proprietorship was overstated in petitioners' return. Amounts of overstatements determined. 2. Held, that for each of the taxable years, the amount of the sales of said proprietorship was understated in petitioners' return. Amounts of understatements determined. 3. Held, that for each of the years 1946 through 1952, petitioners are not entitled to larger deductions for selling and advertising expenses of said proprietorship, than were allowed by respondent. 4. Held, that petitioners' failure to file their 1951 return within the time prescribed by the applicable statute, was due to willful neglect and not due to reasonable cause. Imposition of an addition to tax for said year, under section 291(a) of the 1939 Code, sustained. 5. Held, that at least part of the deficiency for each of the taxable years is due to fraud with intent to evade tax. Imposition of an addition to tax for each of said years, under section 293(b) of the 1939 Code, sustained. 6. Held, that the return filed by petitioners for each of the taxable years 1946 *4 through 1949, was false and fraudulent with intent to evade tax; and that assessment and collection of the deficiencies and additions to tax for said years are not barred by statutory limitation. Louis L. Meldman, Esq., 710 North Plankington Avenue, Milwaukee, Wis., and Sherwin C. Peltin, Esq., for the petitioners. Thomas J. Donnelly, Jr., Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in income tax and additions *5 to tax, as follows: Arthur W. Tobin
Additions to Tax [1]
Docket No.
Year
Deficiency
Sec. 291(a)
Sec. 293(b)
Sec. 294(d)(2)
62059
1946
$2,570.58
$1,285.29
1947
3,357.84
1,725.88
$255.13
1948
86.04
43.02
Arthur W. Tobin and Dorothy Tobin
62058
1949
919.24
615.04
27.29
1950
1,024.32
523.56
142.39
1951
1,894.46
$1,379.92
3,159.83
326.32
1952
808.83
404.41
36.01
1953
1,282.42
641.21
535.14 The cases were consolidated for trial. The issues for decision are: [2]
(1) Whether for each of the taxable years, the cost of scrap brass and copper purchased by the principal petitioner's metalsmelting proprietorship, was overstated on petitioners' return. (2) Whether for each of the taxable years, the amount of the sales of said proprietorship was understated on petitioners' return. (3) Whether, for each of the taxable years 1946 through 1952, petitioners are entitled to larger deductions for selling and advertising expenses of said proprietorship, than were allowed by the respondent. (4) Whether the *6 late filing of petitioners' return for the taxable year 1951, was due to reasonable cause and not due to willful neglect, within the meaning of section 291(a). (5) Whether at least part of any deficiency for each of the taxable years, is due to fraud with intent to evade tax within the meaning of section 293(b). (6) Whether assessment and collection of any deficiencies and additions to tax, for the taxable years 1946 through 1949, are barred by statutory limitation. *7 Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits annexed thereto, is incorporated herein by reference. Petitioners Arthur W. and Dorothy Tobin are husband and wife, residing in Milwaukee, Wisconsin. Arthur filed an individual income tax return for each of the years 1946, 1947 and 1948; and both petitioners filed a joint income tax return for each of the years 1949 through 1953. All these returns were filed with the collector or district director of internal revenue at Milwaukee, Wisconsin. The term "petitioner," as hereinafter used, refers only to the husband Arthur W. Tobin. Petitioner, during all the taxable years, was the sole proprietor of a metal-smelting business which he operated under the name of Cream City Smelting Works (hereinafter sometimes referred to as "Cream City"). This business had, in earlier years, been operated by petitioner's father; and the petitioner, beginning at the age of about 13 years, had worked there part time while he completed his schooling. His education consisted of grade school, 2 1/2 years of high school, and 2 years of trade school. He had no bookkeeping or accounting training. In *8 1938 petitioner's father died; and thereupon petitioner became the sole proprietor of said business. At the time of the trial herein, petitioner was 51 years of age. Re purchase of scrap materials The principal business activity of petitioner's Cream City proprietorship was the manufacture and sale of brass and bronze ingots. The principal raw materials used in the smelting were scrap brass and copper, which were purchased by petitioner from scrap dealers, salvage dealers, auto wreckers, and various manufacturing plants. The scrap materials so purchased were sorted, melted, and purified; and the metal, while still in molten state, was pressed into ingot molds. The ingots were sold by petitioner to brass-casting foundries. The procedure generally employed in handling a purchase of scrap metal was as follows. The scrap metal was weighed upon its arrival at petitioner's plant; and a printed form of receipt was then made out in duplicate, which showed the name of the seller, the weight and kind of material, the price per pound, and the total amount due the seller. The original of such receipt was given to the seller, and the duplicate was retained by the petitioner. Payment for *9 the material was then made with a regular check of Cream City, issued to the order of the seller. Such check was drawn in the amount shown to be due on the retained duplicate of the above-mentioned receipt; and it was signed, either by petitioner himself or by his office assistant, Catherine Cody. [3] The amount of each such check was thereupon entered in the books of account of the proprietorship, as a purchase of materials; and it also was included in petitioner's income tax return for the year in which the check was issued, as part of the purchases (cost of goods) of said proprietorship. During all taxable years, petitioner maintained his accounting records under the supervision of a public accountant. *10 The respondent, in his notices of deficiency herein, determined that for each of the taxable years involved, the amount of the purchases of scrap metal by or for the Cream City proprietorship was overstated in petitioner's return; and that the aggregate amount of such overstatements for all said years, was $30,260.71. Of this aggregate amount, $2,080.57 represents respondent's correction of an erroneous closing entry on the proprietorship's accounts as of the end of the taxable year 1949; and such adjustment, notwithstanding petitioners' pleaded objections to all of respondent's adjustments, was not challenged either at the trial or in petitioners' briefs. The balance of said aggregate amount represents the total of 105 checks, aggregating $28,180.24, which the proprietorship issued from time to time during the taxable years, and entered in its books of account as payments for purchases of scrap metal; but which the respondent disallowed, on the ground that these checks did not actually represent such purchases. [4]
*11 As to only three of these 105 disallowed checks was the identity of the designated payee established. Of these, item 78, in the amount of $251.23, was made payable to M. [Mark] Johnson who was a personal friend of petitioner; and it was not delivered as consideration for any materials purchased by or for Cream City, and did not represent an ordinary and necessary business expense of said proprietorship. Item 80, in the amount of $112.90, was made payable to R. Reinke who also was a personal friend of petitioner; it was delivered principally for football tickets for petitioner, and was not either a purchase of materials or an ordinary and necessary business expense of the proprietorship. And item 105, in the amount of $122.98, was issued in error to an improperly designated payee who, after cashing the same, refunded the proceeds to the petitioner; and this check also does not represent either a purchase of materials or an ordinary and necessary expense of said Cream City proprietorship. On all the remaining 102 checks which were disallowed by respondent as not representing purchases, the payee was designated by an initial or abbreviation and last name - such for example as "P. *12 Kader"; and there is no notation or memorandum which shows either the address, the truck license number, or any other data by which such payee can be identified. Respondent's agents made an extensive investigation in an effort to determine the identity or existence of such payees, or to find persons having similar names. The agents conferred, in this regard, with both the petitioner and his office assistant. They examined the directories for the City of Milwaukee and the surrounding communities, covering the years 1943 through 1953; and they examined also various telephone books for such area. They obtained from the Milwaukee City Clerk's office, and examined, the complete record of all persons licensed to deal in scrap metal. And they also conferred with various scrap-metal dealers in the area, and examined the names appearing on the latters' lists of customers. This investigation, however, failed to establish either the identity or existence of any of said designated payees. Petitioner likewise was unable, either during the course of said agents' investigation or at the trial herein, to identify any of the designated payees of said 102 checks. Seventy-one of such disallowed checks *13 were cashed at a bar, known as the Mitchell Park Tap, which was located about 3 1/2 blocks from the Cream City plant. The proprietors thereof were William Pilger and William Grintjes. During the years involved, petitioner was a frequent patron of this bar; and on some days he spent 4 or 5 hours there, drinking and gambling with the other patrons. The manner in which most of the 71 checks cashed at said bar were endorsed for payment, is as follows: "As to 54 of these checks, petitioner conceded during the course of testimony being offered by a handwriting expert, that he is the person who endorsed thereon the name of the designated payee; and he identified such checks in an oral stipulation. The second endorser of all said 54 checks was either Pilger or Grintjes, one of the proprietors of said bar. "On 10 more of said 71 checks (items 1, 7, 20, 37, 47, 51, 54, 55, 58 and 61), the endorsement of the designated payee's name was in the handwriting of Pilger; and on each of these, the second endorser was Grintjes. "On another check in this group (item 88), the designated payee's name was not endorsed by anyone; and the only endorsement thereon was that of Pilger. "On 3 other checks *14 in such group (items 17, 24 and 25), the endorsements of the names of the three different designated payees are all in the same handwriting." Among the remaining disallowed checks as to which the designated payee could not be identified, are the following: "Two checks (items 5 and 9), which were not cashed at the Mitchell Park Tap, have been conceded and orally stipulated by petitioner to have been endorsed by himself, each in the name of a designaed payee other than himself. These checks are in addition to the other above-mentioned 54 checks cashed at the Mitchell Park Tap, as to which petitioner conceded that he had endorsed the designated payee's name. "Ten other disallowed checks (items 64, 67, 69, 71-76, and 79) were all cashed at a tavern operated by a man named Martin Lepej. The amounts of these checks ranged from $76.80 to $566.04, and all but 4 of them were for more than $200 each. The tavern owner cashed all these checks, without knowing the designated payee, as a personal accommodation to petitioner's above-mentioned friend, Mark Johnson. "Three other disallowed checks (items 68, 70, and 77), as to which the designated payee can not be identified, have as the second *15 endorser thereof, either said Mark Johnson or a member of his family." None of the 86 disallowed checks which have hereinabove been specifically mentioned represents either a purchase of materials or an ordinary and necessary business expense of the Cream City proprietorship. The distribution of these 86 checks, by taxable years, is: Total
Total
Year
Checks
Amount
1946
24
$ 6,345.24
1947
20
5,703.65
1948
18
4,600.80
1949
12
2,444.43
1950
7
1,716.08
1951
4
1,410.42
1952
0
1953
1
122.98
Total
86
$22,343.60
The remaining 19 checks, included among the 105 purchase checks which respondent disallowed, do represent purchases of materials by or for Cream City; and the amounts thereof are properly includible in the purchases (cost of goods) of said proprietorship. The distribution of these 19 checks, by taxable years, is: Total
Total
Year
Checks
Amount
1946
4
$1,139.27
1947
6
1,275.15
1948
0
1949
0
1950
1
101.64
1951
4
1,162.61
1952
2
1,524.34
1953
2
633.63
Total
19
$5,836.64
The proprietorship's purchases of scrap materials were overstated in petitioner's return for each of the taxable *16 years except the year 1952. The respective total amounts of such overstatements per year, are those shown in the first of the last two tables (i.e., the table pertaining to the distribution of 86 disallowed checks); except that, for the taxable year 1949, the total overstatement of purchases includes also the amount of the mathematical error of $2,080.57 above mentioned - so that the total amount by which the purchases of 1949 were overstated is $4,525. Re sales of scrap materials Although the principal business activity of petitioner's Cream City proprietorship was the manufacture and sale of brass and bronze ingots, the petitioner, in connection with such business, also sold various scrap materials to wholesale scrap dealers in Milwaukee. The respondent, in his notices of deficiency herein, determined that for each of the taxable years involved, the amount which petitioner or his proprietorship received from such sales of scrap was understated in petitioners' income tax return; and that the aggregate amount of such understatements for all said years was $12,989.18. This aggregate amount is represented by 70 checks totaling said amount, all but one of which actually were issued *17 by various wholesale scrap dealers in payment for scrap materials purchased by them, and which were made payable to various purported payees named therein. [5] Respondent determined that the amounts of all these checks represented unreported sales of materials by petitioner's proprietorship. Two of these 70 disputed checks (items 25b and 58) actually do not represent sales made by or on behalf of Cream City; and accordingly, the amounts thereof do not constitute unreported sales of petitioner. As to two other checks in this group (items 14 and 53a), petitioner conceded at the trial herein that these do represent sales of materials by his proprietorship, which were not (by reason of claimed oversight) entered *18 in the proprietorship's books of account or reported in petitioners' income tax returns. Accordingly the amounts of these two checks do constitute unreported sales of petitioner. All the remaining 66 disputed sales checks were issued by three particular wholesale scrap dealers: 31 were issued by Parks Iron & Metal Company during the years 1946 through 1953; 31 were issued by A. Cohen & Sons Company during the years 1949, 1950, 1951 and 1953; and 4 were issued by Wisconsin Rag & Metal Co. during the years 1949 and 1950. And all of these 66 checks that were received in evidence (4 of them were not produced, so the endorsements could not be examined), were cashed at the previously mentioned Mitchell Park Tap. As hereinbefore found, this was a bar operated by William Pilger and William Grintjes, of which the petitioner was a frequent patron. Fifty-seven of said 66 disputed checks were drawn to the order of a payee who was designated only by a first initial and a last name; and there is no notation or record of any address, license number, or other means of identification for any of them. As in the case of the purchase checks previously considered, respondent's agents made an extensive *19 investigation, in an effort to determine the identity or existence of the designated payees on all the disputed checks. They examined the directories of the City of Milwaukee and the surrounding communities, for the years 1943 through 1953; the telephone books for said area; the official lists of licensed scrap dealers in the City of Milwaukee; and the customer lists of various scrap-metal purchasers. This investigation failed to establish the identity of any of such designated payees; but it did develop that there were a few persons engaged in the scrap metal business in Milwaukee area who had names similar to certain of the designated payees. None of such persons having similar names (several of whom were witnesses at the trial) had ever seen the checks in question, or had received any of the proceeds thereof. As to 58 of said 66 disputed checks, petitioner is the person who endorsed the name of the designated payee thereon, notwithstanding that he was not the payee named on any of them. At the trial he conceded that such is the fact as to 34 of said 58 disputed checks; and he identified the same in an oral stipulation. On still another of said 66 disputed checks, the endorsement *20 of the designated payee's name thereon was written by Pilger, one of the operators of the Mitchell Park Tap, although he was not such designated payee. All of the last mentioned 59 checks that were endorsed by petitioner or by Pilger were issued either by the said Parks Company or by the said Cohen Company. On several occasions when petitioner sold scrap material to said Parks Company, he supplied one of the owners of that company with a fictitious name to be used in designating the payee on the checks issued for such material; and the petitioner then received such check. Four of the other disputed purchase checks were issued by the Wisconsin Rag & Metal Company. Only one of these was produced in evidence; but on this, the name of the designated payee was endorsed in the handwriting of petitioner, although he was not the named payee. On various occasions when petitioner sold scrap material to this Wisconsin Company, he requested president Caviale of said company to make out the checks for the materials to some name other than that of himself or his Cream City proprietorship. Caviale, acting pursuant to such request, thereupon selected the fictitious name of "S. Kratz" or "Sam Kratz. *21 " It has been stipulated that, on all four of the disputed checks issued by said Wisconsin Company, the name of the designated payee is identical with one form or other of said fictitious name. Although the checks were made out to "Kratz" the receiving tickets for the material were made out to petitioner's Cream City proprietorship. Except for the two sales checks (items 25b and 58) which we have hereinbefore found did not represent unreported sales of petitioner, all of the 70 disputed sales checks here involved were issued by wholesale scrap dealers in payment for scrap materials sold by or on behalf of petitioner's Cream City proprietorship; and the proceeds of all the same were received by petitioner, but were not included in the sales reported on his returns. A year by year summary of said checks, and of the amounts of the proceeds thereof which were not reported in petitioner's returns, is as follows: Total
Total
Year
Checks
Amount
1946
10
$ 2,864.39
1947
4
731.69
1948
5
684.13
1949
16
1,742.11
1950
11
1,242.32
1951
11
2,281.63
1952
4
1,038.47
1953
7
1,874.44
Total
68
$12,459.18
All of these amounts represent unreported sales *22 of petitioner's proprietorship for the respective years shown. From one to six of the checks above listed for each of the taxable years are those as to which petitioner has conceded and stipulated that he is the person who endorsed the designated payee's name thereon. Re other issues The respondent, in his notices of deficiency herein, determined that during the taxable years 1946 through 1952, petitioner had entered in his Cream City proprietorship's books of account as selling expenses, and had deducted on his income tax returns, the amounts of 31 checks of said proprietorship, aggregating $3,571.95, [6] which were not allowable as ordinary and necessary business expenses of said proprietorship. A summary of these checks by taxable years is as follows: Total
Total
Year
Checks
Amount
1946
5
$1,350.00
1947
4
715.00
1948
2
225.00
1949
8
500.00
1950
4
210.00
1951
5
309.95
1952
3
262.00
Total
31
$3,571.95
*23 All of said checks for which deduction was so disallowed were signed either by the petitioner or by his office assistant in accordance with his instructions. All of them were made payable to petitioner personally; and he received the proceeds thereof. And all were, at petitioner's direction, entered in the proprietorship's accounts as selling expenses, purportedly incurred in entertaining customers, without knowledge on the part of the office assistant who made the entries, as to how the proceeds actually were to be, or were, expended. There is no written record or memorandum of either petitioner or the proprietorship which indicates where or when or for what purpose any portion of said amounts was spent. Regarding two persons who were named at the trial as being among those purportedly entertained, one was neither a current nor prospective customer of petitioner's business, and the other was the above-mentioned personal friend of petitioner, Mark Johnson. None of the above-mentioned amounts constitutes an ordinary and necessary business expense of petitioner's Cream City proprietorship. On December 23, 1947, petitioner drew a Cream City check, made payable to himself in the *24 amount of $700; and he cashed the same at the above-mentioned Mitchell Park Tap. The amount of this check was, at petitioner's direction, entered on the proprietorship's accounts as advertising expense, purportedly used in purchasing Christmas gifts for customers; and in petitioner's income tax return for the year 1947, said amount was included in total advertising expenses of $1,972.26, for which deduction was claimed. Respondent disallowed deduction for this $700 item; but he did allow deduction for the balance of said advertising expenses. Most of the Christmas gifts for the petitioner's customers were purchased from advertising agencies; and there is no invoice, sales slip or other record which tends to show how, where, or for what, the $700 proceeds of this particular check were expended. No part of the above-mentioned $700 represents an ordinary and necessary business expense of petitioner's Cream City proprietorship. In February 1952, a certified public accountant who supervised the accounts maintained for petitioner's proprietorship prepared a joint 1951 income tax return for petitioner and his wife; and he delivered the same to petitioner at his office. Petitioner placed *25 this return in his desk; and he did not file the same on or before the due date thereof, which was March 15, 1952. Subsequently on several occasions, said accountant saw this unfiled return, and he told petitioner that it should be filed. Petitioner, however, did not file it. Finally on February 2, 1955, after an investigation of petitioner's returns had been begun by agents of the respondent, the accountant personally filed the return on behalf of petitioner and his wife. The failure to file this joint 1951 income tax return within the time prescribed by the applicable statute was due to willful neglect and not due to reasonable cause. The income tax returns of petitioner or of him and his wife, for all taxable years other than said year 1951, were timely filed. A declaration of estimated tax was filed by petitioner or by him and his wife for each of the years 1947 and 1949 through 1953. Respondent's two notices of deficiency, which together cover all of the taxable years involved, were mailed on February 17, 1956. At least part of the deficiency for each of the taxable years here involved is due to fraud with intent to evade tax. The income tax return filed by petitioner *26 or by him and his wife, for each of the taxable years including the years 1946 through 1949, was false and fraudulent with intent to evade tax. Opinion All of the issues here presented for decision involve, primarily, questions of fact. As to the first four, the burden of establishing error in the respondent's determinations is on the petitioner. As to the other two which pertain to fraud, the burden of proof is of course on the respondent. The pertinent facts as to each issue, that have been established by the evidence, have hereinabove been set forth in considerable detail in our Findings of Fact; and we believe that no useful purpose would be served by here again making any extended review of the same. 1. Regarding the first four issues, we have carefully examined and analyzed all the relevant evidence as to each, including the stipulations and the numerous exhibits; and we have, after hearing each of the witnesses testify, observing their demeanor, and analyzing their testimony in relation to the other evidence, determined what appropriate weight and credibility should be accorded to the statements of each. From all this, we are convinced and have found and concluded, *27 that the determinations made by respondent in his notices of deficiency should be sustained, except as we have otherwise specifically set forth in our Findings of Fact. Principal among such exceptions is our conclusion that 19 particular purchase checks which are in dispute under the first issue should be allowed as representing actual purchases of petitioner's proprietorship. These 19 checks were cashed separately at various business establishments and professional offices; there is no evidence of any irregularity or unusual circumstances in connection with their handling; and we think that the lack of identification of the payees named herein is not, taken by itself, sufficient to warrant their disallowance. Our holdings as to the first four issues, which are in accordance with our Findings of Fact, are as follows: "(a) That as to the first issue, petitioner did overstate the purchases of his proprietorship on his income tax return for each of the taxable years, except for the year 1952; and that the respective amounts of such overstatements per year, are those which we have set forth in our Findings of Fact. "(b) That as to the second issue, petitioner did understate the amounts *28 of the sales of his proprietorship, on his income tax return for each and all of the taxable years involved; and that the respective amounts of such understatements per year, are those which we have set forth in our Findings of Fact. "(c) That as to the third issue, petitioner has failed to sustain his burden of establishing that any of the particular items of selling, traveling and advertising expenses which respondent disallowed as deductions for the years 1946 through 1952, actually did constitute ordinary and necessary expenses of his proprietorship; and accordingly, that the respondent's action in disallowing deductions for the amounts of said items should be and is approved. "(d) That as to the fourth issue, the failure of petitioner and his wife to file their joint 1951 income tax return within the time prescribed by the applicable statute, was due to willful neglect and not due to reasonable cause; and accordingly, that the respondent's determination that an addition to tax under section 291(a) should be imposed for the taxable year 1951 should be and is approved." 2. The fifth issue is whether at least part of the deficiency for each of the taxable years is due to fraud *29 with intent to evade tax within the meaning of section 293(b). Based on our analysis and weighing of all the evidence of record, and more particularly that pertaining to the first two prior issues, we are convinced beyond any reasonable doubt that such question should be answered in the affirmative. In reaching this conclusion we have relied only upon the affirmative proof in the record, and not upon any presumption as to the correctness of the respondent's determinations. Such affirmative evidence includes in part: The numerous disputed purchase checks and sales checks involved; the testimony of petitioner and other witnesses, regarding their participation in the issuance, endorsement and cashing of these numerous checks; the concessions and explanations of petitioner as to his endorsement of the name of the unidentified designated payee, on a large portion of such checks; the testimony and demonstrations of respondent's handwriting expert, as to who actually did endorse many of the checks not covered by petitioner's concessions; and all other relevant facts and surrounding circumstances established by the evidence. From the foregoing, we are satisfied beyond any reasonable doubt *30 that petitioner, on numerous occasions during the 8-year period here involved, issued checks to fictitious payees in purported payment for scrap materials, which he then endorsed and cashed for his own benefit; caused wholesale scrap dealers to issue checks in the names of fictitious payees, which he then received, endorsed and cashed for his own benefit; and caused false and misleading entries to be made on the accounts of his proprietorship. And we are further convinced the petitioner, by such means and with willful and fraudulent intent to evade tax, overstated the purchases of his proprietorship for all except one of the taxable years involved; and understated the sales of said proprietorship for each and all of the taxable years. We have rejected, as being untruthful and not worthy of belief, the explanation offered by petitioner that his conceded endorsement of a large portion of said disputed purchase and sales checks was due solely to requests of unidentified payees, and that many of such endorsements were due to such payees having grimy and dirty hands, and not having a pencil with which to make the endorsements themselves. Also, we have rejected, as incredible and untruthful, *31 the testimony of William Pilger, William Grintjes and Mark Johnson, regarding their reasons for participating in the endorsement or cashing of other disputed checks here involved. We hold as to said fifth issue, that the respondent's determinations of additions to tax under section 293(b), for all taxable years involved, should be and are approved. 3. The sixth issue is, whether the returns filed for the taxable years 1946 through 1949 (as to which years the statute of limitation is involved) were false and fraudulent with intent to evade tax, within the meaning of section 276(a). For the reasons above stated in respect to the fifth issue, we think that this question also should be answered in the affirmative. Accordingly, we hold that the return filed for each of said taxable years was false and fraudulent with intent to evade tax within the meaning of said statute; and that assessment and collection of the deficiencies and additions to tax for these years are not barred by any statutory limitation. Decisions will be entered under Rule 50. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1939.↩
2. None of the other issues raised by the pleadings need here be decided, for the following reasons: Issues pertaining (a) to the amounts deductible as medical expenses for the years 1949, 1950 and 1952, and (b) to the amounts of any substantial underestimates of the estimated taxes declared by petitioners in their declarations of estimated tax for the years 1947 and 1949 through 1953, all depend upon the outcome of the other issues herein considered; and appropriate adjustments as to these will hereafter be made in the computations under Rule 50. Issues pertaining to deductions claimed by petitioners for personal property taxes and contributions for the year 1950, are deemed to have been abandoned by petitioners; for no evidence and no argument as to these were presented. Issues pertaining to whether assessment and collection of tax liabilities for the years 1950 and 1951 are barred by statutory limitation, were abandoned by petitioners at the trial, following concessions made by them in their pleadings.↩
3. The name of petitioner's office assistant, at the time she was first hired in 1940, was Catherine Cody; but in 1942, she remarried, and her name then became Catherine McKenzie. Her signature card at the bank wherein the Cream City account was maintained, was not changed to reflect this change of name. All Cream City checks signed by her in the taxable years bear the signature "C. Cody"; but on all other occasions relevant to this case, she used the name, "Catherine McKenzie."↩
4. These 105 disallowed checks (all of which are in evidence) are summarized in a joint exhibit of the parties (Exhibit 9-I) that was received in evidence, which shows by separate item numbers: The name of the designated payee, the date, number and amount of each check; the name of the person who signed it; and the names of all individual endorsers. Such checks are hereinafter referred to by the item numbers shown in said joint exhibit.↩
5. These 70 checks (all but 4 of which are in evidence) are summarized in a joint exhibit of the parties (Exhibit 10-J) that was received in evidence, which shows by separate item numbers: Name of the issuing company; the date of issuance; the amount of the check; the names of the first endorsers (designated as the payees): and also the names of all secondary individual endorsers. Such checks are hereinafter referred to by the item numbers shown in said joint exhibit.↩
6. These 31 checks (all received in evidence) are described in an exhibit of petitioner that was received in evidence (Exhibit 18), which shows as to each, the date, number, and amount of the check; and the name of the person by whom it was signed on behalf of the proprietorship. In the case of two of such checks issued in the year 1952, $100 of each (being 50 per cent of the face amount of each) was charged to petitioner, personally; and the amounts so charged are not here in dispute.↩